Jonathan Shub (NJ Bar I.D. 317842020)
Kevin Laukaitis
**SHUB LAW FIRM LLC**
134 Kings Hwy. E., 2nd Floor
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

*Attorneys for Plaintiffs and the Proposed Classes*
[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MELISSA JIMENEZ and CATALINA OCAMPO, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br>v.<br><br>JOHNSON & JOHNSON CONSUMER, INC.,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Melissa Jimenez and Catalina Ocampo (hereinafter, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own actions, and, as to all other matters, alleges, upon information and belief and investigation of their counsel, as follows:

## NATURE OF THE ACTION

1.      This is a consumer class action lawsuit brought individually by Plaintiffs and on behalf of all persons in the below-defined proposed Classes, all of whom purchased Johnson &

Johnson Consumer Inc.'s ("Defendant" or "J&J") Neutrogena-branded sunscreen products that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers (hereinafter, the "Product" or "Products").

2.     Defendant manufactures, sells, markets, and distributes several over-the-counter Sunscreen Products under its brand name "Neutrogena." Several of Defendant's Neutrogena sunscreen products (identified below) have been independently tested and shown to be adulterated with benzene, a known human carcinogen. The presence of benzene in Defendant's Neutrogena Sunscreen Products was not disclosed in the products' label, in violation of state and federal law.

3.     Defendant's advertising and marketing campaign, however, is false, fraudulent, deceptive, and misleading. Unbeknownst to Plaintiffs and members of the Classes at the time of their purchase, and contrary to the express representations on the Products' labels, these Products contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

4.     As a result of Defendant's unlawful and highly deceptive conduct, Plaintiffs and members of the Classes have been and continue to be harmed by purchasing a product under false pretenses. Furthermore, Plaintiffs and members of the Classes paid a premium for the Products based on the misrepresentation made by Defendant that the Products were safe and effective and were not adulterated with benzene. Accordingly, Plaintiffs and members of the Classes paid more for the Products than they otherwise would have, if at all, and suffered an injury in the amount of the premium paid.

5.     Plaintiffs and the Classes bring claims for consumer fraud, fraudulent concealment, and unjust enrichment and seek damages, injunctive and declaratory relief, interest, costs, and reasonable attorneys' fees.

## PARTIES

6.      Plaintiff Melissa Jimenez is a resident and citizen of Kings County, New York. Ms. Jimenez purchased multiple bottles of Defendant's Neutrogena Beach Defense Spray Body Sunscreen SPF 50 each summer during the relevant class period. Ms. Jimenez made these purchases in-store at a brick-and-mortar such as Walgreens, Rite Aid, or CVS. Upon information and belief, Ms. Jimenez's most recent purchase was of a bottle of the Product that was part of a batch found by Valisure to contain benzene in excess of the FDA limit. When purchasing the Product, Ms. Jimenez reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the Product was properly manufactured, free from defects, and safe for its intended use. During that time, based on the false and misleading claims by Defendant, Ms. Jimenez was unaware that Defendant's Product may be adulterated with benzene. Ms. Jimenez purchased Defendant's Product on the assumption that the labeling of Defendant's Product was accurate and that the product was unadulterated, safe, and effective. Ms. Jimenez relied on these representations and warranties in deciding to purchase the Product manufactured by Defendant, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendant if she had known that it was not, in fact, properly manufactured and free from defects, and that there was a risk the product may contain benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase a product she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

7.      Plaintiff Catalina Ocampo is a resident and citizen of Cook County, Illinois. Ms. Ocampo has purchased multiple bottles of Defendant's Neutrogena Ultra Sheer Weightless Sunscreen Spray, SPF 100+. Most recently, Plaintiff purchased one (1) bottle of the Product in

approximately April or May 2021. Plaintiff also purchased two (2) bottles of the Product in approximately June 2020. Ms. Ocampo made these purchases in-store at a brick-and-mortar such as Walgreens or CVS. Upon information and belief, Ms. Ocampo's most recent purchase was of a bottle of the Product that was part of a batch found by Valisure to contain benzene in excess of the FDA limit. When purchasing the Product, Ms. Ocampo reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the Product was properly manufactured, free from defects, and safe for its intended use. During that time, based on the false and misleading claims by Defendant, Ms. Ocampo was unaware that Defendant's Product may be adulterated with benzene. Ms. Ocampo purchased Defendant's Product on the assumption that the labeling of Defendant's Product was accurate and that the product was unadulterated, safe, and effective. Ms. Ocampo relied on these representations and warranties in deciding to purchase the Product manufactured by Defendant, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendant if she had known that it was not, in fact, properly manufactured and free from defects, and that there was a risk the product may contain benzene, a known human carcinogen. As a result, Plaintiff suffered injury in fact when she spent money to purchase a product she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

8.     Defendant, Johnson & Johnson Consumer Inc., is a corporation with its principal place of business and headquarters in New Brunswick, New Jersey.  At all relevant times hereto, Defendant was engaged in the manufacturing, marketing, distributing, and advertising the Products throughout the United States. On information and belief, Defendant developed and/or authorized the false, fraudulent, misleading, and deceptive advertisements and labeling of the Products from

its New Jersey headquarters.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one

member of the Class, as defined below, is a citizen of a different state than Defendant, there are

more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000

exclusive of interest and costs.

10.      This Court has personal jurisdiction over this action because Defendant is

headquartered in this District, regularly conducts business in this District, and/or under the stream

of commerce doctrine by causing its products to be disseminated in this District; and therefore is

subject to general jurisdiction in the state of New Jersey.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is

headquartered here and conducts substantial business in this District.

## FACTUAL ALLEGATIONS

12.      The presence of benzene in the Products renders them adulterated and misbranded.

As a result, the Products are illegal to sell under federal law and therefore worthless. *See* 21 U.S.C.

§ 331(a); *see also Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019);

*see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.,* 2021 WL 222776, at *16

(D.N.J. Jan. 22, 2021).

13.      Benzene is used primarily as a solvent in the chemical and pharmaceutical

industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in

gasoline. The major United States source of benzene is petroleum. The health hazards of benzene

have been recognized for over one hundred years. According to the National Toxicology Program

("NTP"), benzene is "*known to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in humans."[1]

14.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals. The Department of Health and Human Services has determined that benzene causes cancer in humans. Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity." Benzene is associated with blood cancers such as leukemia.[2] A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[3] which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[4]

15.     According to the American Cancer Society:

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[5]

---

[1] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis added).

[2] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[3] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54 (https://www.cabdirect.org/cabdirect/abstract/19402700388).

[4] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148 (https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646).

[5] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html).

16.     Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[6] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[7]

17.     Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[8]

18.     According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[9] Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

19.     The FDA regulates sunscreens to ensure they meet safety and effectiveness

---

[6] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.
[7] *Id*. at 34.
[8] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[9] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

standards.[10] The FDA regulates sunscreens, including the Sunscreen Products at issue here, as over-the-counter ("OTC") drugs rather than as cosmetics. As an FDA-regulated product, sunscreens must pass certain tests before they are sold. As noted on FDA's website,

> Every drug has active ingredients and inactive ingredients. In the case of sunscreen, active ingredients are the ones that are protecting your skin from the sun's harmful UV rays. Inactive ingredients are all other ingredients that are not active ingredients, such as water or oil that may be used in formulating sunscreens.[11]

20.     Defendant manufactures, markets, and sells a variety of Neutrogena sunscreen products, including:

a. Neutrogena Ultra Sheer Weightless Sunscreen Spray, SPF 100+
b. Neutrogena Ultra Sheer Weightless Sunscreen Spray, SPF 70
c. Neutrogena Beach Defense Oil-Free Body Sunscreen Spray-SPF 100
d. Neutrogena Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+
e. Neutrogena Beach Defense Spray Body Sunscreen SPF 50

| 1 | Neutrogena | Lotion | Age Shield Face Sunscreen Lotion SPF 110 |
|---|---|---|---|
| 2 | Neutrogena | Lotion | Age Shield Face Sunscreen Lotion, SPF 70 |
| 3 | Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 |
| 4 | Neutrogena | Lotion | Beach Defense Water Plus Sun Protection SunscreenBroad Spectrum Lotion SPF 70 |
| 5 | Neutrogena | Spray | Cooldry Sport Water-Resistant Sunscreen Spray SPF 50 |
| 6 | Neutrogena | Spray | Cooldry Sport Water-Resistant Sunscreen Spray SPF 70 |
| 7 | Neutrogena | Lotion | Healthy Defense Daily Moisturizer with Sunscreen SPF50 |
| 8 | Neutrogena | Lotion | Hydro Boost Water Gel Lotion Sunscreen SPF 50 |
| 9 | Neutrogena | Spray | Kids Water-Resistant Sunscreen Spray Oil-Free SPF 70 |
| 10 | Neutrogena | Lotion | Oil-free Facial Moisturizer with Sunscreen SPF 15 |
| 11 | Neutrogena | Lotion | Pure & Free Baby Sunscreen Lotion - SPF 50 |
| 12 | Neutrogena | Lotion | Sensitive Skin Sunscreen Lotion With SPF 60+ |
| 13 | Neutrogena | Lotion | Sheer Zinc Dry-Touch Face Sunscreen SPF 50 |
| 14 | Neutrogena | Spray | Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 30Spray |
| 15 | Neutrogena | Spray | Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 45 |
| 16 | Neutrogena | Lotion | Ultra Sheer Dry-Touch Sunscreen Lotion Broad SpectrumSPF 55 |
| 17 | Neutrogena | Lotion | Ultra Sheer Dry-Touch Sunscreen Lotion SPF 30 |

---

[10] *See generally* 21 CFR §§352.1– 352.77.
[11] https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun.

| 18 | Neutrogena | Lotion | Ultra Sheer Dry-Touch Sunscreen Lotion SPF 45 |
| 19 | Neutrogena | Lotion | Ultra Sheer Dry-Touch Water Resistant Sunscreen SPF 70 |
| 20 | Neutrogena | Spray | Ultra Sheer Face Mist Sunscreen SPF 55 |
| 21 | Neutrogena | Spray | Ultra Sheer Face Mist Sunscreen Spray - SPF 55 |
| 22 | Neutrogena | Lotion | Ultra Sheer Liquid Sunscreen Lotion, Broad SpectrumSPF 70 |
| 23 | Neutrogena | Lotion | Ultra Sheer Sunscreen Lotion SPF 100+ |
| 24 | Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ |
| 25 | Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 |
| 26 | Neutrogena | Spray | Wet Skin Swim Humidity Sweat Sunscreen Broad Spectrum SPF 30 (hereafter collectively referred to as"Sunscreen Products").[12] |

21.     Skin cancer is the most common form of cancer in the United States. About 4.3 million people are treated for basal cell cancer and squamous cell skin cancer in this country every year.[13]

22.     Accordingly, the FDA routinely evaluates sunscreen products to ensure that they are safe and effective, and to ensure that the sunscreens adequately protect consumers from skin cancer when used as directed.[14]

23.     In fact, because sunscreen products make representations that they help prevent sunburn and decrease the risks of cancer and early skin aging, such products are classified as drugs by the FDA, which subjects them to certain safety and effectiveness standards.

24.     Thus, the presence of any known human carcinogen in consumer products, like sunscreens, that are so regularly used by adults and children to prevent skin cancer would be

---

[12] Discovery may reveal additional Sunscreen Products manufactured, sold, and distributed by Defendant that are affected by this action and Plaintiffs reserve their right to include any such products in this action.
[13] U.S. Food & Drug Administration, Tips to Stay Safe in the Sun: From Sunscreen to Sunglasses, https://www.fda.gov/consumers/consumer-updates/tips-stay-safe-sun-sunscreen-sunglasses?gclid=CjwKCAjwwqaGBhBKEiwAMk-FtF7PGrWAQkn3pHjD_ssT9LepBno PftmckwxKZKCkHGVoQbjtFw4mrhoCQ2IQAvD_BwE.
[14] *Id.*

especially concerning and would affect a substantial part of the population.

25.     While investigating the carcinogenic potential of active ingredients in sun care products, Valisure, an online pharmacy registered with the FDA, recently detected high levels of benzene, a known human carcinogen, in several brands and batches of sunscreen, which, as discussed above, are considered drug products by the FDA.[15]

26.     In 2020, Valisure LLC and ValisureRX LLC ("Valisure"), an analytical pharmacy, ran tests on a variety of Defendant's Sunscreen Products listed below using a sophisticated gas chromatography flame ionization test modified to follow FDA guidance for impurities detection.[16] Specifically, Valisure tested numerous lots of Defendants' spray and lotion Sunscreen Products. Through its testing, Valisure discovered that certain of the Sunscreen Products contain benzene, with values ranging from less than 0.1 parts per million ("ppm"), 0.10 ppm to 2 ppm, and more than 2 ppm. For reference, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "skin absorption" as an exposure route.[17] Notably, benzene is not listed as an active or inactive ingredient on any of the labels of Neutrogena's Sunscreen Products. Moreover, all of the Sunscreen Products are marketed and advertised in an identical manner — as "Sunscreen."

27.     All of Defendant's listed products were found to contain quantities of benzene in excess of the "FDA concentration limit of 2 parts per million (ppm)."[18]

---

[15] Valisure, Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care products, May 24, 2021, https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/, at 1.
[16] *Id*. at 1,7.
[17] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (https://www.cdc.gov/niosh/npg/npgd0049.html).
[18] *Id*. at 12.

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| | | | | | | | | | |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 04721E02 | 2023-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 5.20 5.59* | 5% |
| | | | | | | | | | |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| | | | | | | | | | |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | |

28.    In fact, Defendant's Products overall had the ***highest levels of benzene*** detected in the sunscreen products tested by Valisure.

29.    Nevertheless, benzene is not one of the listed ingredients on the Products' labels. For example, the labels for Defendant's Neutrogena Beach Defense Oil-Free Body Sunscreen Spray – SPF 100 and Defendant does not indicate to consumers that the Products may contain benzene as an ingredient:









30.     Due to the presence of phenyl groups (similar chemical structures to benzene) in the molecules of some sunscreen active ingredients, Valisure investigated the possibility of six sunscreen active ingredients (avobenzone, oxybenzone, octisalate, octinoxate, homosalate, and octocylene) forming benzene from degradation by the aforementioned GC-MS analytical method through analysis of pure reference standards at concentrations relevant to typical sunscreen products. No substantive benzene was detected.[19]

31.     Thus, the presence of benzene in Defendant's Products appears to be ***the result of contamination*** (*i.e.*, a manufacturing defect), rather than a design effect.[20]

32.     According to Valisure, because the presence of benzene is the result of contamination, benzene is not unavoidable in the manufacture of sunscreens, and therefore, any significant detection of benzene in such products "should be deemed unacceptable."[21]

33.     Valisure further stated that "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total [benzene] exposure."[22] Dr. Christopher Bunick, MD, PhD, and Associate Professor of Dermatology at Yale University agreed, stating:

> Considering that human skin has a large total surface area (~1.85 m2), and that ~28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products. The total mass of sunscreen required to cover and protect the human body, in single daily application or repeated applications daily, means that even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene.[23]

34.     Defendant also knew or should have known about the carcinogenic potential of

---

[19] *Id*. at 7-8.
[20] *Id*.
[21] *Id*. at 2.
[22] *Id*. at 16.
[23] *Id*. at 17.

benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, thereby defining it as "carcinogenic to humans."[24]

35.     As a result of the concerning findings, on May 25, 2021, Valisure filed its citizen petition with the FDA asking the FDA to recall all batches of Defendant's Products that contained benzene on the basis that they are adulterated  under Section 501 of the Federal Drug and Cosmetics Act ("FDCA") and misbranded under Section 502 of the FDCA, in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352, respectively.

36.     Pursuant to 21 U.S.C. § 331(a) of the FDCA, the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded" is categorically prohibited.

37.     Yet, as of the date of this filing, the FDA has not responded to Valisure's citizen petition and Defendant has not taken any action to remove the Products from the market, and to this day dangerous sunscreen products are continuing to be sold to unsuspecting consumers.

38.     Nevertheless, Defendant proclaims in its advertising that "Neutrogena maintains that the sunscreen ingredients we use are safe and effective . . .", which is a false and misleading statement.

39.     Defendant's failure to control for benzene contamination and continued sale of its adulterated products constitutes actionable fraud.

40.     Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendant has failed to warn consumers of this fact. Such illegally sold products are worthless and have no value. *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir.

---

[24] *Id*. at 1.

2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.,* 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure. Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for."). Plaintiffs and class members bargained for a sunscreen product free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendant sold them a sunscreen product containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

41.     As the Products expose consumers to benzene well above the legal limit, the Products are not fit for use by humans. Plaintiffs are further entitled to damages for the injury sustained in being exposed to high levels of acutely-toxic benzene, damages related to Defendant's conduct, and injunctive relief.

42.     Plaintiffs seek to recover damages because the Products are adulterated, defective, worthless, and unfit for human use due to the presence of benzene, a carcinogenic and toxic chemical impurity.

43.     Plaintiffs and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and they seek injunctive relief and restitution for the full purchase price of the sunscreen product(s) they purchased. Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

44.     Plaintiffs bring this action on behalf of themselves and the Classes for equitable relief and to recover damages and restitution for: violation of the consumer protection statutes invoked herein; fraudulent concealment; and unjust enrichment.

*Defendant's Marketing and Sale of the Products Violates Federal Law*

45.     Section 5(a) of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

46.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

47.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, the Products are either "foods" or "drugs" as defined in Section 15(b) and (c) of the FTC Act, 15 U.S.C. §§ 55(b), (c). Under these provisions, companies must have a reasonable basis for making objective product claims.

48.     As alleged herein, Defendant has represented that the ingredients in its sunscreen Products are safe and affective and are not adulterated with benzene. However, these representations are false, deceptive, and misleading as the Products actually contain dangerous levels of benzene. The making of such misrepresentations by Defendant constitutes a deceptive act or practice and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

## CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23. The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiffs bring this

action and seek certification of the following Classes:

> **Nationwide Class:** All persons within the United States who purchased the Products.

> **New York Sub-Class:** All persons within the State of New York who purchased the Products.

> **Illinois Sub-Class:** All persons within the State of Illinois who purchased the Products.

50.     The Nationwide Class, New York Sub-Class, and Illinios Sub-Class shall collectively be referred to herein as the "Classes."

51.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

52.     Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

53.     **Numerosity** – Federal Rule of Civil Procedure 23(a)(1). The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiffs, the true

number of members of the Classes are known by Defendant. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

54.     **Typicality** – Federal Rule of Civil Procedure 23(a)(3). The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity. The representative Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

55.     **Commonality and Predominance** – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

  a.  whether the Products manufactured by Defendant contain elevated and/or dangerously high levels of benzene;

  b.  whether Defendant knew or should have known the Products contained elevated levels of benzene prior to selling it, thereby constituting fraud and/or fraudulent concealment;

  c.  whether Defendant has unlawfully converted money from Plaintiffs and the Classes;

  d.  whether Defendant violated the consumer protection laws alleged herein;

  e.  whether Defendant is liable to Plaintiffs and the Classes for unjust enrichment;

  f.  whether Defendant is liable to Plaintiffs and the Classes for fraudulent concealment;

19

g.  whether Plaintiffs and the Classes have sustained monetary loss and the proper measure of that loss;

h.  whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief;

i.  whether Plaintiffs and the Classes are entitled to restitution and disgorgement from Defendant; and

j.  whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

56.     **Adequacy of Representation** – Federal Rule of Civil Procedure 23(a)(4). Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes. Plaintiffs have no interests that are antagonistic to those of the Classes.

57.     **Insufficiency of Separate Actions** – Federal Rule of Civil Procedure 23(b)(1). Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

58.     **Declaratory and Injunctive Relief** – Federal Rule of Civil Procedure 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief,

as described below, with respect to the members of the Classes as a whole. In particular, Plaintiffs seek to certify a Class to enjoin Defendant from selling or otherwise distributing the Products as labeled until such time that Defendant can demonstrate to the Court's satisfaction that the Products confer the advertised benefits and are otherwise safe to use as intended.

59.     **Superiority** – Federal Rule of Civil Procedure 23(b)(3). A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

60.     In the alternative, the Classes may be certified because:

    a.  the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

    b.  the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.  Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

## COUNT I

**Violations of New Jersey Consumer Fraud Act ("CFA")**
**N.J.S.A. § 56:8-1,** *et seq.*
**(On Behalf of the Nationwide Class)**

61.  Plaintiffs, individually and on behalf of the members of the Class, incorporate by reference all of the foregoing paragraphs of this Complaint, as if fully alleged herein.

62.  The New Jersey CFA was enacted and designed to protect consumers against unfair, deceptive and fraudulent business practices. N.J. Stat. Ann. §56:8-1, *et seq.*

63.  N.J. Stat. Ann. §56:8-2 provides:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . [.]

64.  Plaintiffs, members of the Class, and Defendant are "persons" within the meaning of the CFA. N.J. Stat. Ann. §56:8-1(d).

65.  The mislabeled Product sold by Defendant is "merchandise" within the meaning of the CFA, and Plaintiffs and other members of the Class are "consumers" within the meaning of the CFA and, thus, are entitled to the statutory remedies made available in the CFA. *Id.* § 56:8–1(c).

66.     Defendant, through its advertisements and labeling, used unconscionable commercial practices, deception, fraud, concealment, false promises, and misrepresentations, in violation of the CFA, in connection with the marketing and sale of the Products.

67.     Further, Defendant knowingly concealed and omitted material facts to the Plaintiffs and Members of the Class regarding the ingredients in the Products. These deceptive acts and omissions caused Plaintiffs and members of the Class to sustain damages in an amount to be proven at trial.

## COUNT II

**Violation of the New York Deceptive Trade Practices Act,
New York Gen. Bus. Law § 349, *et seq*.
(On behalf of the New York Sub-Class)**

68.     Plaintiff Jimenez incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

69.     By reason of the acts set forth above, Defendant has been and is engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

70.     Defendant engaged in unfair and/or deceptive conduct by, *inter alia*, making the representations that the ingredients in its sunscreen Products were safe and effective and were not adulterated with benzene.

71.     Defendant further engaged in unfair and/or deceptive conduct by, *inter alia*, omitting the fact that the prescense of benzene exists in the Products and failing to disclose this material information on the Products' labels.

72.     The public is likely to  be damaged because of  Defendant's deceptive trade practices  or  acts.  Specifically,  Defendant's  false,  deceptive,  or  misleading  statements

implicate the health and safety of those consumers deceived by Defendant.

73.     Defendant directs its conduct at consumers, as Defendant's false, deceptive, or misleading statements are contained in marketing targeted toward consumers, including social media and retail product packaging. As such, Defendant's conduct as alleged herein is consumer oriented.

74.     Defendant's deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

75.     Defendant's deceptive acts affect the public interest in the state of New York because, upon information and belief, consumers located in New York have purchased Defendant's Products in reliance on Defendant's false, deceptive, or misleading statements.

76.     As a result of Defendant's use of employment of unfair or deceptive acts or business practices, Plaintiff Jimenez and each of the other members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

## COUNT III

**Violation of the New York Deceptive Trade Practices Act,
New York Gen. Bus. Law § 350, *et seq*.
(On behalf of the New York Sub-Class)**

77.     Plaintiff Jimenez incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

78.     Defendant has made material, false or misleading statements or representations of fact about the Products. Specifically, Defendant has literally, impliedly, or by necessary implication made the representations in its labels that its sunscreen Products contain only the ingredients listed in the label, and that the ingredients in its sunscreen Products were safe and effective and were not adulterated with benzene, none of which are true.

79.     Defendant further engaged in false advertising by, *inter alia*, omitting the fact that the prescense of benzene exists in the Products and failing to disclose this material information on the Products' labels.

80.     Defendant's acts constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Business Law § 350.

81.     The public is likely to  be damaged because of  Defendant's deceptive trade practices or acts. Specifically, Defendant's false or misleading statements and/or ommissions implicate the health and safety of those consumers deceived by Defendant.

82.     As such, Defendant's conduct as alleged herein is consumer oriented.

83.     As a result of Defendant's material, false or misleading statements or representations of fact about the Products, Plaintiff Jimenez and each of the other members of the New York Sub-Class have sustained damages in an amount to be proven at trial.

## COUNT IV

### Violation Of The Illinois Consumer Fraud Act
### (On behalf of the Illinois Sub-Class)

84.     Plaintiff Ocampo incorporates by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

85.     The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq*., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

86.     Plaintiff Ocampo  and other members of the Illinois Sub-Class, as purchasers of the Products, are consumers within the meaning of the ICFA given that Defendant's business activities involve trade or commerce, are addressed to the market generally and otherwise implicate

consumer protection concerns.

87.   Defendant's conduct in misrepresenting the benefits of its Products constitute the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendant's trade or commerce.

88.   Defendant also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff Ocampo and other members of the Illinois Sub-Class knowing that consumers would rely on the advertisements, packaging, and Defendant's uniform representations to purchase the Products.

89.   Once the defect in the Products and its tendency to cause cancer in humans became apparent to Defendant, consumers (Plaintiff Ocampo and other members of the putative Illinois Sub-Class) were entitled to disclosure of that fact because a significant risk of Defendant's sunscreen Products potentially being adulterated with and containing harmful levels of benzene, a human carcinogen, would be a material fact in a consumer's decision-making process, and, without Defendant's disclosure consumers would not necessarily know that there is such a risk.

90.   Defendant intended that Plaintiff Ocampo, and the Illinois Sub-Class would rely on the continued deception by purchasing the Products, unaware of the material facts and omissions described above. Defendant knew that its customers would continue to rely on its representations that the ingredients in its sunscreen Products were safe and effective and were not adulterated with benzene, and knew that consumers would continue to rely upon its silence as to any known risk of the presence of a carcinogenic and toxic chemical impurity, as evidence that the Products were safe. This conduct constitutes consumer fraud within the meaning of the ICFA.

91.   Defendant's material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of

material facts as to the nature of the goods, in violation of the ICFA.

92.     Plaintiff Ocampo and the other members of the Illinois Sub-Class suffered damages as a proximate result of the unfair acts or practices of Defendant alleged herein. Defendant's misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully or with reckless disregard for the consequences of its actions.

93.     Plaintiff Ocampo and other members of the Illinois Sub-Class would not have purchased the Products but for the promised benefits and concealment of any risk of harm because the Products as sold had no intrinsic value to them.

94.     Defendant knowingly accepted the benefits of its deception and improper conduct in the form of profits from the increased sale of the Products.

95.     As a proximate result of the above-described violations of the ICFA, Plaintiff Ocampo and other members of the Class: (a) purchased and used the Products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchasing the Products; and (c) suffered and/or will suffer additional economic losses in repairing and restoring the damage caused by the Products.

96.     Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

97.     Plaintiff Ocampo also seeks to enjoin Defendant's ongoing deceptive practices relating to its claims on the Products' labels and advertising.

## COUNT V

**Fraudulent Concealment**
**(On Behalf of the Nationwide Class, or**
**Alternatively, New York and/or Illinois Subclasses)**

98.     Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

99.     Plaintiffs bring this claim against Defendant on behalf of themselves and the other Members of the Nationwide Class and, alternatively, the individual State subclasses pled in Paragraph 49 (the "Classes").

100.     Defendant had a duty to disclose material facts to Plaintiffs and the Classes given their relationship as contracting parties and intended users of the Products. Defendant also had a duty to disclose material facts to Plaintiffs and the Classes, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

101.     Defendant possessed knowledge of these material facts. Since at least mid-2020, numerous recalls put Defendant on notice that adulterated and misbranded products were being investigated for contamination with carcinogens, including benzene. Further, benzene is not unavoidable in the manufacture of sunscreens.

102.     During this time, Plaintiffs and members of the Classes were using the Products without knowing they contained dangerous levels of benzene.

103.     Defendant failed to discharge its duty to disclose these materials facts.

104.     In so failing to disclose these material facts to Plaintiffs and the Classes, Defendant intended to hide from Plaintiffs and the Classes that they were purchasing and consuming the Products with harmful defects that was unfit for human use, and thus acted with scienter and/or an intent to defraud.

105.     Plaintiffs and the Classes reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products manufactured sold by Defendant had they known they contained unsafe levels of benzene.

28

106.     As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiffs and the Classes suffered damages in the amount of monies paid for the defective Products.

107.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT VI

### Unjust Enrichment
### (On Behalf of the Nationwide Class)

108.     Plaintiffs incorporate by reference all of the foregoing paragraphs of this Complaint as if fully stated herein.

109.     Plaintiffs and the other members of the Nationwide Class conferred benefits on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

110.     Defendant voluntarily accepted and retained this benefit.

111.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

112.     Defendant received benefits in the form of revenues from purchases of the Products to the detriment of Plaintiffs and the other members of the Nationwide Class because Plaintiffs and members of the Nationwide Class purchased mislabeled products that is not what they bargained for and were not safe and effective, as claimed.

113.     Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiffs and the other members of the Nationwide Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs and members of the Nationwide Class, because they would have not purchased the Products had they known the

true facts.

114.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Nationwide Classis unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Nationwide Class for its unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Classes alleged herein, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Classes and Plaintiffs' attorneys as Class Counsel;

B.     For an order declaring the Defendant's conduct violates the causes of action referenced herein;

C.     For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper; and

H.     For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all claims in this Complaint and of any and all issues in this actions so triable as of right.

Dated: June 29, 2021                                   Respectfully Submitted,

*/s/ Jonathan Shub*
Jonathan Shub (NJ Bar I.D. 317842020)
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Gary M. Klinger*
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Ste. 2100
Chicago, Illinois 60606
Phone: 202.640.1160
Fax: 202.429.2294
gklinger@masonllp.com

Gary E. Mason*
David K. Lietz*
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Ave. NW Ste. 305
Washington DC 20016
Phone: 202.640.1160
Fax: 202.429.2294
gmason@masonllp.com
dlietz@masonllp.com

**Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs and the Classes*